# Illinois Official Reports

## Appellate Court

---

**Benton v. Little League Baseball, Inc., 2020 IL App (1st) 190549**

---

| | |
|---|---|
| Appellate Court Caption | DEVONA D. BENTON and FRANK JACKSON, Individually and on Behalf of Their Minor Child, J.B.; ROBERT S. BUFFORD JR., Individually and on Behalf of His Minor Child, C.B.; DAROLD BUTLER SR. and DONITA BRUCE, Individually and on Behalf of Their Minor Child, D.B.; VENISA BEASLEY-GREEN and CHRISTOPHER GREEN, Individually and on Behalf of Their Minor Child, B.G.; CARLTON A. HONDRAS II and SHEREE HONDRAS, Individually and on Behalf of Their Minor Child, C.H.; JERRY F. HOUSTON and MYRTLE HOUSTON, Individually and on Behalf of Their Minor Child, J.H.; EDWARD HOWARD III and CALANDRA HOWARD, Individually and on Behalf of Their Minor Child, E.H.; LINDA SNEED HARRIS, Individually and on Behalf of Her Minor Child, M.J.; NEDRA JONES and ALVIN JONES, Individually and on Behalf of Their Minor Child, P.J.; TAMMY KING and EDDIE KING SR., Individually and on Behalf of Their Minor Child, E.K.; PRENTISS LUSTER and DARLENE LUSTER, Individually and on Behalf of Their Minor Child, P.L.; SANJA E. NOBLE, Individually and on Behalf of Her Minor Child, L.N.; and CLAUDIA HARVEY, Individually and on Behalf of Her Minor Child, D.R., Plaintiffs-Appellants, v. LITTLE LEAGUE BASEBALL, INCORPORATED; JACKIE ROBINSON WEST LITTLE LEAGUE, INC., an Illinois Not-for-Profit Corporation; BILL HALEY, Individually and as Agent and/or Employee of Jackie Robinson West Little League, Inc.; ANNIE HALEY, Individually and as Agent and/or Employee of Jackie Robinson West Little League, Inc.; EVERGREEN PARK ATHLETIC ASSOCIATION, an Illinois Not-for-Profit Corporation; CHRIS JANES, Individually and as Agent and/or Employee of Evergreen Park Athletic Association; ESPN, INC., a Delaware Corporation; and STEPHEN A. SMITH, Individually and as Agent of ESPN, Inc., Defendants-Appellees. |
| District & No. | First District, Second Division No. 1-19-0549 |

| | |
|---|---|
| Filed | June 30, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 16-L-1428; the Hon. John H. Ehrlich, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part. |
| Counsel on Appeal | James A. Karamanis, Kenneth A. Nazarian, and Emily A. Herbick, of Barney & Karamanis, LLP, of Chicago, for appellants. |
| | Scott T. Schutte, Tedd M. Warden, and Tyler Zmick, of Morgan, Lewis & Bockius LLP, of Chicago, for appellee Little League Baseball, Inc. |
| | Brian A. Sher and Demetria L. Hamilton, of Bryan Cave Leighton Paisner LLP, of Chicago, and Nathan E. Siegel, of Davis Wright Tremaine LLP, of Washington, D.C., for appellees ESPN, Inc., and Stephen A. Smith. |
| | Melinda S. Kollross and Paul V. Esposito, of Clausen Miller P.C., of Chicago, for appellees Jackie Robinson West Little League, Inc., Bill Haley, and Annie Haley. |
| | No brief filed for other appellees. |
| Panel | JUSTICE LAVIN delivered the judgment of the court, with opinion. Justices Pucinski and Coghlan concurred in the judgment and opinion. |

## OPINION

¶ 1        In August 2014, Jackie Robinson West, an all African-American baseball team from the south side of Chicago, won the United States Little League World Series (World Series) title. This event aired nationally on ESPN to much acclaim, causing these 10-, 11-, and 12-year-old "South Siders" to become national media darlings before a tragic confluence of events led to the players being stripped of their title some six months later in February 2015, amid allegations of residency rule violations.

- 2 -

¶ 2       This appeal arises out of a lawsuit filed by the Jackie Robinson West parents/guardians, individually and on behalf of their 13 minor children, against Little League Baseball, Inc. (Little League), the team's corporate entity Jackie Robinson West Little League, Inc. (Jackie Robinson West, Inc.[1]), team president Annie Haley and team treasurer Bill Haley (collectively, the Haleys), as well as ESPN, Inc., and its employee Stephen A. Smith (ESPN/Smith), among others. Several counts were also individually filed by team manager and head coach Darold Butler (Coach Butler), who is also a parent. The suit included claims for breach of implied contract, promissory estoppel, defamation, intentional and negligent infliction of emotional distress, false light, and civil conspiracy. The Jackie Robinson West players also sought to be reinstated as champions. As to the second-amended complaint, the trial court dismissed with prejudice all counts filed by the parents on their own behalf and several counts filed on the children's behalf. The court, however, denied motions to dismiss claims for breach of implied contract (count I) and promissory estoppel (count II), and intentional infliction of emotional distress (counts VI and VIII), which were filed on behalf the children.

¶ 3       This interlocutory appeal followed with Little League, Jackie Robinson West, Inc./the Haleys, and ESPN/Smith filing briefs in response. For the reasons delineated below, we affirm the trial court's judgment dismissing the various counts but hold that reinstatement of the championship title remains a viable remedy as to counts I and II.

¶ 4                                              I. BACKGROUND
¶ 5       The following facts are gleaned from the pleadings, motions, exhibits, and orders that precede this appeal. Little League is a not-for-profit corporation providing international youth baseball and softball programs for players ages 4 to 18. To participate, players of the correct age must live within or attend school within certain geographical boundaries designated annually by each local league. Jackie Robinson West, Inc., with players emanating from the south side of Chicago, was just one of these locally chartered teams and had gained approval from Little League in late April 2014. Although such teams form annually, the Jackie Robinson West team is a storied South Side league, dating as far back as the 1980s. In support of the 2014 charter, Jackie Robinson West, Inc., submitted the requisite boundary map to Illinois Little League District 4 (District 4), since each local league was to determine its own boundaries. Plaintiffs alleged in their second-amended complaint that District 4 then emailed the map to the next organizational tier, Little League's central regional office in Indianapolis, Indiana. In addition to the Jackie Robinson West team, District 4 supervised three other Chicago-area little league teams.

¶ 6       The Jackie Robinson West team began its regular baseball season in May 2014 and concluded a month later. Only certain players then participated in the post-season tournaments. With help from Coach Butler, Jackie Robinson West created a formidable team of 13 all-star players. Subject to great fanfare and media coverage, this team won regional and state championships, and in August 2014, the World Series. The team then competed internationally but ultimately lost to a South Korean team. ESPN televised certain tournaments, including the World Series. This was reportedly the most watched little league series ever on that network.

¶ 7       Up to this point, there was no question that Jackie Robinson West was a legitimate team

_____

[1]Jackie Robinson West, Inc., is the corporate entity and appellee in this case but colloquially the Jackie Robinson West team, as well.

under Little League's guidelines, having advanced and won the World Series fair and square. That view, however, would soon become cloudy. In September 2014, Chris Janes, the vice president of a rival suburban league, approached Little League and protested the Jackie Robinson West players' eligibility based on their residency.[2]

¶ 8     To understand this protest, and by way of background, it is worth noting that before participating in regional tournaments in July, Coach Butler created a binder containing the Jackie Robinson West children's birth certificates, residency documents, and a boundary map dated May 1, 2014.[3] This binder served as supporting documentation for the requisite "Tournament Team Eligibility Affidavit," meant to ensure that the 13 players were qualified under Little League rules to play for Jackie Robinson West. The affidavit lists the players by name, identifies their residences/schools, and states that the residences/schools listed for each player had to be inside the boundaries defined by the submitted map. Significantly, this photocopied tournament map was the same as that attached to the team's original charter and signed by team president Haley and Little League district administrator Michael Kelley. This simple boundary map provided a black-line graphic of the north, south, east, and west borders and appeared to plot the players' corresponding residences/schools within the boundaries.

¶ 9     The parties do not dispute that the addresses listed in the affidavit under each of the players' names were correct. Little League, however, maintains "the actual addresses were outside the eligible borders for players." In other words, not all of the 13 players resided within the team's identified boundaries. It is this detail that allegedly fell through the cracks and rendered the Jackie Robinson West team reportedly ineligible to compete.

¶ 10    In spite of this discrepancy, the affidavit contains various signatures by officials from Jackie Robinson West, Inc., and Little League, guaranteeing the accuracy of the information contained therein. For example, Coach Butler, president Haley, and district administrator Kelley signed the affidavit in July 2014. Little League regional tournament director Nina Johnson also certified the affidavit as being accurate in July 2014.

¶ 11    Plaintiffs presented this eligibility affidavit for review to the "Tournament Director" at each of their post-season tournaments, including at the World Series.[4] Additionally, the affidavit stated that if the tournament committee, which league guidelines vested with sole authority over tournaments, deemed any player ineligible due to residency problems, the team could forfeit the tournament game and be removed from play.[5] It could also result in removal

---

[2]Plaintiffs originally named Janes and his little league organization, Evergreen Park Athletic Association, as defendants in this lawsuit, but they have since been dismissed from the suit.

[3]Little League attached the eligibility affidavit and a version of the original charter map to their motion to dismiss the second-amended complaint.

[4]Plaintiffs allege the eligibility affidavit that was certified by the "District Administrator" (Kelley) was presented to the "Tournament Director" before the Illinois District Four Tournament (July 3-4, 2014), the Illinois Section Three Tournament (July 14-21), the Illinois State Championship (July 22-27), the Great Lakes Regional Tournament (July 31-August 9), and the Little League World Series Tournament (August 10-23). Plaintiffs did not attach an eligibility affidavit to their second-amended complaint. From the aforementioned affidavit that is included in the record on appeal, it appears that there was only one eligibility affidavit, and each of the directors of these tournaments signed and dated it before or at the time of the tournament play.

[5]The tournament committee, located at Little League headquarters in Williamsport, Virginia, was not the authority responsible for the regular season.

of personnel from league activities.

¶ 12     It apparently was this residency rule that Janes focused on in his protest. In response, Little League "conducted an investigation and determined the Tournament Affidavit addresses were correct." Plaintiffs, however, maintain that as of September and October, other Little League officials and the team's corporate personnel knew something was up. Plaintiffs maintain that regional tournament director Johnson and another Little League official had notified team treasurer Haley by e-mail that several players were ineligible because they lived outside the identified boundaries. Plaintiffs allege that, despite this knowledge, none of the defendants took any steps to inform Jackie Robinson West parents and players of the team's eligibility problems. Rather, defendants allegedly chose to conceal or ignore these problems during and/or after tournament play. Alternatively, plaintiffs maintain that Little League found the team had no residency problems during the tournament. Little League countered that the review process for tournaments did not include verifying the accuracy of boundaries or ensuring the addresses fell within the boundaries. Yet, Little League also stated that district administrator Kelley was responsible for verifying the boundaries and the plotting of players' addresses within those boundaries.

¶ 13     Even in the face of the eligibility doubts, the players, not knowing any better, accepted an invitation to the White House, where they met former President Barack Obama. That fall, the players attended a Major League Baseball World Series game. The international president and CEO of Little League was present at both of these events.

¶ 14     While plaintiffs claim they "believe" the players were all eligible and within the acceptable boundaries, plaintiffs likewise acknowledge that in December 2014, team treasurer Haley tried to correct any eligibility problems by "expanding" the boundary map. In other words, he attempted to retroactively absorb territory from the other little leagues (presumably within District 4), so that the ineligible children now lived within the map's newly drawn boundaries. On the heels of these actions, a second investigation conducted by Little League in response to increased media pressure revealed the above-stated eligibility problems with the team's map. According to Little League, Jackie Robinson West officials and district administrator Kelley submitted a backdated map that attempted to retroactively change the team's boundaries and correct the residential eligibility issue. Thus, it was in December 2014 that Little League higher-ups apparently became aware of any alleged fraud involving the maps.

¶ 15     Consequently, on February 11, 2015, Little League issued a news release that it was vacating and revoking the Jackie Robinson West team's regional and national championship titles.[6] The release stated that both Jackie Robinson West, Inc., and district administrator Kelley had "knowingly violated Little League International Rules and Regulations by placing players on [the Jackie Robinson West team] who did not qualify to play because they lived outside the team's boundaries." They were specifically accused of using a falsified boundary map for their 2014 tournament. According to the release, Stephen D. Keener, Little League international president and CEO, stated that, upon review, "it became clear that" team officials and district administrator Kelley "signed documents to make players eligible who should not have been." According to the release, these matters only came to the attention of the tournament officials in January 2015, "when local league officials confirmed that they had direct knowledge of this rule violation, but never reported it to Little League International, as

---

[6]The full news release is appended to this opinion.

is common with local league operations." The release announced that as a result of these deceptions, Coach Butler had been suspended from Little League activity, district administrator Kelley had been removed from his position, and the team had been placed on probation. Notably, the release did not specifically direct any comments at the Jackie Robinson West parents.

¶ 16     The first TV news programs to report on the stripping of the team's title was ESPN's *First Take*, a segment wherein commentators Smith and his co-anchor Skip Bayless debate the sports news of the day.[7] Just hours after Little League issued its news release on February 11, *First Take* began its segment with that breaking news story. *First Take* host Cari Champion summarized the Little League news release set forth above and then showed a clip from an interview with Keener, who commented that the decision was necessary to maintain Little League's integrity. Keener, however, added that no one should blame the players, who appeared not to know of the rule violations.

¶ 17     Champion then turned to Smith for his reaction, and Smith opined:

> "I'm in pain over this one, to be quite honest with you, because of those kids. They're innocent in all of this by all accounts. They were of age, they came together as a team, they just went out there and they compete and *** you see these stories and they just resonates [*sic*] with you in such a profoundly positive way and the adults screw it up because of, you know, starving for notoriety, starving for recognition, starving to win and willing to sell kids dreams out in order to pull it off."

Smith added that this was only the third time something like this had happened in Little League.

¶ 18     Smith then addressed Bayless:

> "[L]et's put their names out here. You [got a] team manager by the name of Darold Butler suspended from any little league activity. Good. We've got Michael Kell[e]y, Illinois District 4 administrator removed from his position. Good. Hopefully it will be permanently because this is completely and utterly unnecessary."

¶ 19     Smith continued his commentary, stating:

> "[A]nd let me also add what really resonates to me and what makes this hurt even more *** This is called the Jackie Robinson West Team. Jackie Robinson, as renowned a figure in sports annuls as ever there was, responsible for integrating major league baseball in 1947, an iconic and revered, [deified] figure in our community and in American history. You have his name attached to this because it's Jackie Robinson West, ok? First all African American team to win the championship and this is how you did it. Just disgraceful."

Smith stated, "thank God the kids really had nothing to do with this," as they were just victims. He concluded, however, that "[a] bunch of adults and parents who knew better *** decided to do this. Pox on all of their houses. They should all be ashamed of themselves."

¶ 20     In response, Bayless noted that he had repeatedly seen Coach Butler's face during the World Series. Smith then stated:

> "I'd like to see it again *** Let's get a picture of Darold Butler. Since you want to sit there and throw kids in to the wind like this this. If this was somebody else—if it was a professional athlete, if one of these kids had gotten in trouble or something like

---

[7]A printed version of the ESPN news segment is appended to this opinion.

that, we'd put their face up. Let's put Darold Butler and Michael Kell[e]y's face up on national television. Treat it like the mug shot it deserves to be treated like. How about that?"

¶ 21 Bayless then asked Smith whether any kids on the team knew "they were crossing boundaries that they weren't supposed to cross?" Bayless said:

"Again, the parents were saying 'do it,' the manager's saying 'do it' but you[']re] sending such a bad message to kids, surely some of the kids—they know the rules, they knew they weren't in this district."

In reply, Smith stated:

"Usually in the case of kids, you don't necessarily know ***, but the adults knew, the parents knew, the coach, the administrator—they knew, and they did it anyway hoping that folks would never find out while they got their 15 minutes of fame. They didn't think about the kids. They thought about themselves. The parents *** have to prove where they live. So what I'm saying to you is that there's been some falsified documentation—or something going on here because you knowingly engaged in deceit—So you can have your kid play ineligibly. Inexcusable."

¶ 22 The segment concluded with Champion stating it is "unfortunate that the children have to pay for these adult mistakes." She then proceeded into the next segment about the Dallas Cowboys. Notably, Smith never identified Coach Butler as a parent during this news program. Likewise, he never singled out any other parents by name.

¶ 23 Exactly a year later, plaintiffs filed suit on February 11, 2016. At issue is their 22-count second-amended complaint, alleging breach of contract, promissory estoppel, defamation, intentional infliction of emotional distress, negligent infliction of emotional distress, false light, and civil conspiracy. Plaintiffs alleged, in the main, that Little League and Jackie Robinson West, Inc./the Haleys knew of the potential eligibility problems in the fall of 2014 or before, but covered up these facts to gain profit and notoriety on the backs of the parents and their children, to their emotional and economic detriment. In addition, plaintiffs alleged that those defendants knew or should have known that the players were not qualified under the rules and regulations, and yet, up the entire chain of command, they failed to enforce the Little League rules and regulations to the detriment of both the parents and players. Plaintiffs also alleged that ESPN/Smith, in reporting on the matter, falsely accused the parents of participating in the cheating scandal or cover-up, thereby defaming them. Coach Butler added that ESPN/Smith went so far as to suggest he had committed a crime, which was also defamatory.

¶ 24 In response, Little League and ESPN/Smith filed separate motions to dismiss under section 2-619.1 of the Code of Civil Procedure (Code) (see 735 ILCS 5/2-619.1 (West 2016)). Jackie Robinson West, Inc./the Haleys filed a motion to dismiss under section 2-615 of the Code (see 735 ILCS 5/2-615 (West 2016)). At a hearing, the trial court carefully considered the counts in the complaint and entered detailed oral findings, which comprised its order. The court dismissed with prejudice counts III-V, alleging defamation; counts VII and IX-XI, alleging intentional infliction of emotional distress as to the parents; counts XII-XVIII, alleging negligent infliction of emotional distress; counts XIX-XXI, alleging false light; and count XXII, alleging civil conspiracy.

¶ 25 The court denied dismissal of counts VI and VIII, alleging intentional infliction of emotional distress as to the children, as well as count I, alleging breach of implied contract,

and count II, alleging promissory estoppel, which were also filed on behalf of the children. Notwithstanding the ruling on counts I and II, the court held that reinstatement of the championship title was not an available remedy under the facts alleged.

¶ 26 Accordingly, the court dismissed with prejudice all counts relating to the parents and ESPN/Smith and only some relating to the children. The present case was then severed from that of the children, which remained pending in the trial court under a different and consolidated trial court number, No. 18 L 00178. The court then entered an order finding there was no just reason to delay appealing the dismissed counts, and plaintiffs appealed pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016).

¶ 27                                    II. ANALYSIS

¶ 28 In reviewing the merits of the instant appeal, we note that motions to dismiss pursuant to sections 2-615 and 2-619 admit all well-pleaded facts together with all reasonable inferences that can be gleaned from those facts. *Spillyards v. Abboud*, 278 Ill. App. 3d 663, 668 (1996). They do not, however, admit conclusions of law or conclusions of fact unsupported by allegations of specific fact upon which those conclusions rest. *Id.* A motion to dismiss pursuant to section 2-615 attacks the legal sufficiency of the complaint, and the essential question is whether the allegations of the complaint, when construed in the light most favorable to the plaintiff, are sufficient to establish a cause of action upon which relief may be granted. *Cochran v. Securitas Security Services USA, Inc.*, 2017 IL 121200, ¶ 11. A section 2-619 motion, on the other hand, raises defects or defenses that negate plaintiff's cause of action completely or refute crucial conclusions of law or conclusions of material fact that are unsupported by allegations of specific fact. *In re Estate of Shelton*, 2017 IL 121199, ¶ 21 (under section 2-619(a)(9), a defendant is entitled to a dismissal if " 'the claim asserted against defendant is barred by other affirmative matter avoiding the legal effect of or defeating the claim' " (quoting 735 ILCS 5/2-619(a)(9) (West 2010))); *Spillyards*, 278 Ill. App. 3d at 668. In ruling on a section 2-619 motion, this court may consider all pleadings, supporting documents, and discovery documents, construed in favor of the nonmoving party. *Shelton*, 2017 IL 121199, ¶ 21; *Spillyards*, 278 Ill. App. 3d at 668.

¶ 29 Nonetheless, we review dismissal under either section *de novo*, and this requires no deference to the trial court's reasoning. *Spillyards*, 278 Ill. App. 3d at 668; see also *Shelton*, 2017 IL 121199, ¶ 21; *Cochran*, 2017 IL 121200, ¶ 11. We can thus affirm on any basis present in the record. *Nesby v. Country Mutual Insurance Co.*, 346 Ill. App. 3d 564, 566 (2004). The focus on review is whether a genuine issue of material fact should have precluded dismissal or, absent such issue of fact, whether dismissal is proper as a matter of law. *Spillyards*, 278 Ill. App. 3d at 668. As we review this case, we examine the parties' various contentions on appeal while addressing each of the counts of the second-amended complaint in chronological order. As we do so, we specify which of the plaintiffs (the parents, players, or Coach Butler) filed the counts against which of the defendants (Little League, Jackie Robinson West, Inc./the Haleys, and ESPN/Smith).

¶ 30                A. Standing and the Remedy of Reinstating the Championship Title

¶ 31 Plaintiffs first argue that the trial court erroneously deprived them of the remedy of reinstating the 2014 championship title under counts I and II of the second-amended complaint.

They argue specific performance in the form of reinstatement is the only remedy that would make them whole again, and as such, there is no adequate legal remedy.

¶ 32    Defendant Little League does not dispute that reinstatement of the championship title is a possible remedy but argues that plaintiffs lack standing to pursue such relief. Little League raised this argument in its motion to dismiss filed under section 2-619(a)(9) of the Code. See *In re Estate of Schlenker*, 209 Ill. 2d 456, 461 (2004) (noting, such an "affirmative matter" may properly be challenged through a motion to dismiss under that statute). As such, it was then, and is now, Little League's burden to plead and prove that plaintiffs lack standing. See *Law Offices of Colleen M. McLaughlin v. First Star Financial Corp.*, 2011 IL App (1st) 101849, ¶ 16. For the reasons to follow, Little League fails in that endeavor.

¶ 33    The standing doctrine permits consideration of only those disputes that are truly adversarial and capable of resolution by judicial decision. *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 488 (1988). The doctrine thus ensures that issues are raised only by parties having a real interest in the outcome of the controversy. *In re Estate of Schumann*, 2016 IL App (4th) 150844, ¶ 15. In Illinois, standing is defined as some injury in fact to a legally recognized interest. *Greer*, 122 Ill. 2d at 492; *Martini v. Netsch*, 272 Ill. App. 3d 693, 695 (1995). More precisely, the claimed injury, whether actual or threatened, must be distinct and palpable, fairly traceable to the defendant's actions, and substantially likely to be prevented or redressed by granting the requested relief. *Greer*, 122 Ill. 2d at 492-93. The decision as to standing can depend on the issue involved, the nature of the relief sought, and whether the party asserting standing will thereby benefit. *Martini*, 272 Ill. App. 3d at 695.

¶ 34    Although Little League maintains that plaintiffs have failed to demonstrate a legally recognized interest at stake, we find the allegations in the complaint contradict that contention. See *id.* (noting that we look to the allegations in the complaint to determine whether the plaintiff has standing to sue). In count I, plaintiffs, the Jackie Robinson West players, by and through their parents, sued Little League for breach of an implied contract in fact, which is a cause of action where an agreement is arrived at by consideration of the parties' acts and conduct. *Cable America, Inc. v. Pace Electronics, Inc.*, 396 Ill. App. 3d 15, 20 (2009). Such a contract arises not by express agreement but, rather, by a promissory expression which may be inferred from the facts and circumstances which show an intent to be bound. *Century 21 Castles by King, Ltd. v. First National Bank of Western Springs*, 170 Ill. App. 3d 544, 549 (1988). The players alleged that Little League represented it would abide by its rules and regulations (as would plaintiffs), and in exchange, the parents paid dues, and their children played through the regular season and tournaments. The players alleged that Little League failed to follow its own rules and regulations, and it was this breach of the implied contract that led the parents/players to forfeit their paid dues, time, and the ultimate 2014 tournament title. See *McLaughlin*, 2011 IL App (1st) 101849, ¶ 18 (generally, for purposes of determining whether standing exists, "only a party to a contract, or one in privity with a party, may sue on a contract"). Specifically, Little League failed to abide by its rules and regulations when it did not identify eligibility protests before the World Series or submit the matter to the tournament committee.

¶ 35    Taking these allegations as true, as we must at this stage, we conclude they set forth a legally recognized interest against foul play by Little League with regard to its own rules and regulations, given the parents and players' investment of time and money in the organization. The breach was distinct, palpable, and fairly traceable to Little League's alleged failure to

follow its own rules regarding verifying eligibility and/or reporting problems. The players suffered a distinct injury in fact by the stripping of their hard-won championship title, which would be redressed by reinstating the championship title. The allegations thus were sufficient to establish appropriate standing for plaintiffs to raise the claim.

¶ 36     We reach the same conclusion as to count II, where the Jackie Robinson West players, by and through their parents, alleged promissory estoppel. This requires that they prove (1) the defendant made an unambiguous promise to the plaintiff, (2) the plaintiff relied on such promise, (3) the plaintiff's reliance was expected and foreseeable by the defendants, and (4) the plaintiff relied on the promise to its detriment. *Newton Tractor Sales, Inc. v. Kubota Tractor Corp.*, 233 Ill. 2d 46, 51 (2009). Promissory estoppel is an available cause of action in the absence of a contract. *Id.* at 52. The players similarly alleged that Little League made a promise to abide by its rules and regulations and that the players relied on that promise to their own detriment. For the same reasons as stated above, we conclude plaintiffs established an injury in fact to a legally recognized interest.

¶ 37     In reaching these conclusions, we reject Little League's conclusory assertion that the "legally recognized interest" in the championship title resides only in the corporate entity of Jackie Robinson West, Inc. Little League argues rather confusingly that plaintiffs have no legally recognized interest and, thus, lack standing because they have no ownership interests in the team or the championship title (since Little League claims Jackie Robinson West, Inc., was the corporate entity that won the title). At the same time, Little League acknowledges that standing may exist regardless of "ownership," so long as the complainant has a legally recognized interest. With that concession, Little League defeats its own argument, which appears completely out of left field and offers this court little clarity.

¶ 38     Moreover, Little League's argument that only Jackie Robinson West, Inc., as a not-for-profit corporate entity, could file the claims on behalf of the parents/players must be rejected for several additional reasons. First, Little League has neglected to address the doctrine of associational standing, through which a not-for-profit organization may assert the legal rights of its members in certain circumstances. See *Winnebago County Citizens for Controlled Growth v. County of Winnebago*, 383 Ill. App. 3d 735, 740 (2008). There are three requirements for associational standing, including (1) where the organization's members would otherwise have standing to sue in their own right, (2) where the interests it seeks to protect are germane to the organization's purpose, and (3) where neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Id.*

¶ 39     Yet, contrary to Illinois Supreme Court Rule 341(h)(7), (i) (eff. May 25, 2018), Little League has failed to cite any legal authority for its propositions and has failed to develop its argument as to why that not-for-profit corporation is better suited to file the complaint than the players/parents that comprise the team, without which the corporate entity of Jackie Robinson West, Inc., would be but an empty shell, and there would be no championship title. See *id.* (requiring the argument to contain the contentions of the appellee with citation to the authorities and the record relied on, and points not argued are forfeited). A reviewing court is entitled to have the issues clearly defined and supported by pertinent authority and cohesive arguments; it is not merely a repository into which parties may dump the burden of argument and research, nor is it the obligation of this court to act as an advocate. See *Atlas v. Mayer Hoffman McCann, P.C.*, 2019 IL App (1st) 180939, ¶ 33. Given that it is Little League's burden to establish a lack of standing, it has demonstrably failed.

¶ 40    We conclude that plaintiffs alleged an injury in fact to a legally recognized interest. Based on this determination, we hold that specific performance in the form of reinstatement of the championship title is a possible equitable remedy, at least at this stage in the proceedings, where we take the allegations in the complaint as true. See *Continental Casualty Co. v. Commonwealth Edison Co.*, 286 Ill. App. 3d 572, 578-79 (1997) (the relief available to a plaintiff is derived from the substance of the claim before it); *Koehler v. The Packer Group, Inc.*, 2016 IL App (1st) 142767, ¶ 75 (specific performance is not available as of right but rests in the trial court's sound discretion based on all of the facts and circumstances in evidence). It has been long established that a court will not grant equitable relief if the plaintiff has an adequate remedy at law. *Horwitz v. Sonnenschein Nath & Rosenthal*, 2018 IL App (1st) 161909, ¶ 31. The absence of an adequate remedy at law is not an element of an equitable claim but rather a condition precedent to seeking equity itself. *Id.* The parties thus should have the opportunity to argue whether a legal remedy would be clear, practical, and sufficient to make the plaintiffs whole, and if not, whether specific performance as set forth is appropriate. See *id.* ¶¶ 35-36, 41.

¶ 41                                B. Defamation

¶ 42    Plaintiffs next contend that the trial court erred in dismissing counts III, IV, and V, alleging defamation against ESPN and its reporter, Smith. Plaintiffs argue that during the February 11, 2015, sports news broadcast, Smith made false statements of fact about the Jackie Robinson West parents and Coach Butler regarding the team's alleged eligibility problems. To state a cause of action for defamation, a plaintiff must present facts showing that the defendant made a false statement about the plaintiff, the defendant made an unprivileged publication of that statement to a third party, and the publication caused damages. *Hadley v. Doe*, 2015 IL 118000, ¶ 30. A defamatory statement is one that harms a person's reputation because it lowers the person in the eyes of others or deters them from associating with that person. *Tuite v. Corbitt*, 224 Ill. 2d 490, 501 (2006).

¶ 43    There are two different types of defamatory statements, those that are *per se* and those that are *per quod*. A statement is defamatory *per se* if its harm is obvious and apparent on its face. *Hadley*, 2015 IL 118000, ¶ 30; *Kolegas v. Heftel Broadcasting Corp.*, 154 Ill. 2d 1, 10-11 (1992). There are five categories of such statements, only one of which is relevant to this appeal, and that includes words that impute the commission of a criminal offense. *Id.* Under that category, generally the crime must be an indictable one involving moral turpitude, with death or imprisonment as punishment. *Dobias v. Oak Park & River Forest High School District 200*, 2016 IL App (1st) 152205, ¶ 87. If a defamatory statement is actionable *per se*, the plaintiff need not plead or prove actual damage to his reputation to recover. *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 87 (1996). Rather, those statements that fall in the actionable *per se* categories are considered so obviously and materially harmful to the plaintiff that injury to his or her reputation may be presumed. *Id.* A statement will not be actionable *per se*, however, if the words, when considered in context and given their natural, obvious meaning, are reasonably capable of an innocent interpretation or construction. *Tuite*, 224 Ill. 2d at 502; *Bryson*, 174 Ill. 2d at 90. By contrast, a defamation *per quod* claim is appropriate either (1) where the defamatory character of a statement is not apparent on its face and extrinsic evidence is necessary to demonstrate its injurious meaning or (2) where a statement is defamatory on its face but does not fall into the five categories of statements that are actionable

- 11 -

*per se*. *Bryson*, 174 Ill. 2d at 103. A plaintiff bringing a *per quod* claim must also plead and prove special damages, *i.e.*, "actual damage of a pecuniary nature," in order to recover. *Id.* at 87-88, 103.

¶ 44    In this case, plaintiffs alleged both forms of defamation against ESPN and Smith. In particular, in count III, the Jackie Robinson West parents asserted that during the broadcast, ESPN/Smith committed defamation *per quod* when Smith erroneously charged them with submitting "falsified documentation" to Little League and knowingly engaging in deceit so their kids could "play ineligibly." The parents specifically pointed to Smith's comment, "A bunch of adults and parents who knew better—parents who knew better decided to do this. Pox on all their houses. They should all be ashamed of themselves." According to the parents, this also suggested they were responsible for the lost title. In count IV, Coach Butler asserted that ESPN/Smith committed defamation *per se* when Smith stated that Coach Butler's image should be treated like a mug shot, and in doing so, Smith falsely suggested that he had committed the crime of fraud (which is the first category in a defamation *per se* action). As to count V, which Coach Butler brought against ESPN/Smith, Coach Butler set forth essentially the same allegations, only under defamation *per quod*.

¶ 45    In dismissing these counts, the trial court found first and foremost that Smith's statements were nonactionable opinion and rhetorical hyperbole protected by the first amendment. ESPN/Smith now focus on this point in response to plaintiffs' arguments on appeal.

¶ 46    The first amendment may protect a statement of opinion in limited circumstances, including, as in this case, where the cause of action is brought by private individuals against a media defendant. *Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc.*, 227 Ill. 2d 381, 399 (2008). Under what is a restrictive test, however, a defamatory statement is entitled to first amendment protection only if it *cannot* be reasonably interpreted as stating actual fact. *Id.* at 398; *Solaia Technology, LLC v. Specialty Publishing Co.*, 221 Ill. 2d 558, 581 (2006). This is because a false factual assertion can be just as defamatory when couched within an apparent opinion or rhetorical hyperbole. *Solaia Technology*, 221 Ill. 2d at 581. Statements made as insinuation, allusion, irony, or question also may be considered just as defamatory as direct factual assertions. *Id.* As the United States Supreme Court noted in its seminal case, *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19 (1990), "the statement, 'In my opinion Jones is a liar,' can cause as much damage to reputation as the statement, 'Jones is a liar.' " Thus, to determine whether a statement consists of opinion or fact, we must examine, from the perspective of an ordinary viewer, whether (1) the statement has a precise and readily understood meaning, (2) the statement is verifiable, and (3) the statement's literary or social context signals that it has factual content. *Imperial Apparel*, 227 Ill. 2d at 398. Courts consider the totality of the circumstances on a case by case basis, but place emphasis on whether the statement is capable of objective verification. *Rose v. Hollinger International, Inc.*, 383 Ill. App. 3d 8, 13 (2008). If the statement is factual, and it is false, it is actionable. *Solaia Technology*, 221 Ill. 2d at 582. Whether a statement is a factual assertion that could give rise to a defamation claim is a question of law for the court. *Imperial Apparel*, 227 Ill. 2d at 398.

¶ 47    Before addressing the merits, we first observe that plaintiffs have failed to meaningfully differentiate the defamation *per quod* counts (III and V) from the defamation *per se* count (V). Rather, they seem to lump all the defamatory counts into one on appeal even though they are very distinct. They also do not specify how count III, brought by the parents, qualifies as defamation *per quod*. From the reply brief, plaintiffs appear to clarify that Smith charged the

- 12 -

parents as criminals (a *per se* category), but extrinsic evidence would be needed to prove their identities, since Smith never specifically named them. See *Bryson*, 174 Ill. 2d at 103 (defining a *per quod* action); see also *Moore v. Streit*, 181 Ill. App. 3d 587, 597 (1989) (noting, a statement that does not name an individual is not injurious to that person on its face, and so special damages must be pleaded with particularity). But see *Missner v. Clifford*, 393 Ill. App. 3d 751, 768 (2009) (when the defamed group is sufficiently small and the words may reasonably be understood to have personal reference and application to any member of the group, that group member is defamed as an individual); *cf. Chang Hyun Moon v. Kang Jun Liu*, 2015 IL App (1st) 143606, ¶ 13 (noting that on appeal, the plaintiff had pointed to "extrinsic facts" from his complaint to support his defamation *per quod* claim). Additionally, Coach Butler's status as a parent was never mentioned in the program, and thus, plaintiffs improperly conflate statements about Coach Butler with statements about the parents. This court is entitled to have the issues clearly defined and supported by pertinent authority and cohesive arguments; it is not merely a repository into which parties may dump the burden of argument and research, nor is it the obligation of this court to act as an advocate. Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018); see *Atlas*, 2019 IL App (1st) 180939, ¶ 33. To the extent any arguments remain unclear as to the specific counts, we hold it against plaintiffs as the appellants.

¶ 48 Returning to the substantive arguments, we analyze whether Smith's statements were precise, readily understandable, and verifiable. However, we first examine the social context in which the statements arose and whether that signaled factual content. As ESPN notes, the broadcast at issue was indeed a point-counterpoint commentary on the sports news of the day; as such, it was inherently meant to offer opinion and analysis. This much is clear from the opening, where the broadcaster Champion announced the "breaking news" that Little League stripped the team of its championship and suspended Coach Butler because Jackie Robinson West, Inc., "knowingly violated rules and regulations by placing players on their team who did not qualify to play because they lived outside the team's boundaries." Following comments by Little League's president, wherein he noted the children's innocence, Champion turned to Smith for his reaction.

¶ 49 Smith then offered various strongly stated, emphatic, and sometimes bombastic personal views, including "I'm in pain over this one *** because of those kids." He stated that the Jackie Robinson West children's story "just resonates with you in such a profoundly positive way," but "the adults screw it up because of, you know, starving for notoriety, starving for recognition, starving to win and willing to sell kids dreams out in order to pull it off." Smith thereby vilified the adults involved in the matter—opining emphatically that it is "good" that Coach Butler and district administrator Kelley were suspended—and exonerated the children, while also noting that the identity of the team's namesake, the renowned African American baseball player, Jackie Robinson, "makes this hurt even more." Smith's cohost, Bayless, also makes a few comments throughout. Thus, the exchange here is typical of most sports commentary, in that it is "marked not only by spontaneity, but by the often exaggerated and uncareful exchange of vehemently held opinions." *Hunter v. Hartman*, 545 N.W.2d 699, 709 (Minn. App. Ct. 1996).

¶ 50 Nonetheless, interspersed throughout the commentary are various factual statements. Smith noted, for example, that Little League had existed for 75 years, and a scenario like "this" had only happened three times, with other problems being "over-aged players participating,"

from the Philippines and the Bronx. Smith also noted that Jackie Robinson was a renowned sports figure who was responsible for integrating major league baseball. A reasonable viewer could hardly consider these statements mere opinion or hyperbole. Rather, they are statements of verifiable fact.

¶ 51     It is against this backdrop that Smith again asserted the innocence of the children but then assigned guilt to "[a] bunch of adults and parents who knew better—parents who knew better decided to do this. Pox on all their houses. They should be ashamed of themselves." After noting the children earned their White House meeting, Bayless observed that he saw Coach Butler many times on national television during the tournaments and that he "knows his face." In an exaggerated manner, Smith then stated, "I'd like to see it again," and "Let's get a picture of Darold Butler *** Since you want to sit there and throw kids in to the wind like this." Smith ultimately suggested placing Butler and Kelley's "face up on national television," and asserted, "Treat it like the mug shot it deserves to be treated like." Bayless then queried whether the kids knew they were "crossing boundaries they weren't supposed to cross," to which Smith responded "the adults knew, the parents knew, the coach, the administrator—they knew, and they did it anyway hoping that folks would never find out while they got their 15 minutes of fame. They didn't think about the kids." Smith ends the program noting, "The parents *** have to prove where they live. So what I'm saying to you is that there's been some falsified documentation—*or something going on here* because you knowingly engaged in deceit—So you can have your kid play ineligibly. Inexcusable." (Emphasis added.)

¶ 52     Plaintiffs now argue that, according to the commentary cited immediately above, Smith stated in a precise, readily understood, and verifiable manner that both the team's parents and Coach Butler were "criminals" and that it can be implied they committed "criminal forgery and fraud." Plaintiffs therefore argue that Smith's commentary cannot be considered mere protectable opinion.

¶ 53     We cannot agree. From this, no ordinary viewer would believe Smith had charged the parents and Coach Butler with the commission of a criminal offense. See *Dobias*, 2016 IL App (1st) 152205, ¶ 93 (the relevant inquiry is whether an alleged defamatory statement " 'fairly impute[s] the commission of a crime' in the eyes of the reasonable reader" (quoting *Kirchner v. Green*, 294 Ill. App. 3d 672, 680 (1998))); see also *Greenbelt Cooperative Publishing Ass'n v. Bresler*, 398 U.S. 6, 13-14 (1970) (characterization of a developer's negotiating position as "blackmail" was not defamatory and, under the circumstances, did not suggest commission of a crime); *cf. Van Horne v. Muller*, 185 Ill. 2d 299, 308 (1999) (sustaining defamation *per se* for imputing a crime against a motion to dismiss, where the complaint alleged the defendant radio host had participated in publishing an allegedly false story, which imputed that the plaintiff, a former football player, had physically threatened and assaulted another). First, while most viewers would find falsifying documents or knowingly engaging in deceit in a little league tournament amounted to plain and simple rule breaking or cheating, they would not make the logical leap that it amounted to an indictable offense landing any party in criminal court. Thus, apart from whether Smith's accusations amounted to assertions of fact, they did not amount to assertions of fact as to a crime. We find that "[b]ehavior of this nature is neither unusual nor unexpected from parents and coaches in amateur athletics," and Smith's comments were confined to the context of children's sports. *Green v. Rogers*, 234 Ill. 2d 478, 502 (2009).

¶ 54     We thus find plaintiffs' reliance on *Kumaran v. Brotman*, 247 Ill. App. 3d 216 (1993), misplaced. There, this court reversed the dismissal of the plaintiff's defamation claim after

- 14 -

concluding that the newspaper statements at issue could be found to impute a crime, given that the article accused the plaintiff of "working a scam" by filing numerous fraudulent lawsuits. *Id.* at 219. The court noted that filing frequent, unwarranted lawsuits to procure financial settlements from opposing litigants could be considered a criminal misdemeanor. Here, cheating in children's sports is a far cry from cheating the judicial system.

¶ 55    Second, much of the commentary consisted of exaggerated phrases, hyperbole, imprecise factual statements, or supportable interpretations of the news at hand. For example, no reasonable viewer would conclude Smith really wished a "pox" on the parents' houses. See Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/pox (last visited June 23, 2020) [https://perma.cc/6T8F-CEU5] (defining "pox" as a "disastrous evil," such as a plague or curse). Nor would a reasonable viewer conclude Smith wished to emblazon Coach Butler's face on television as in a mug shot, especially since Smith and ESPN could have easily done that. His comment was the equivalent of saying "it's just criminal what coach Butler did," but no reasonable viewer would understand that to mean Coach Butler actually committed a crime. The mug shot comment was another way of expressing pointed exasperation and was clearly made for dramatic effect to contrast the adults with the innocent children.

¶ 56    Likewise, immediately after the comment charging the parents with falsifying documentation, Smith acknowledged that "something" was "going on here," implying that he did not know exactly what and that he was speculating. See *Wynne v. Loyola University of Chicago*, 318 Ill. App. 3d 443, 452 (2000) ("the vaguer and more generalized the opinion, the more likely the opinion is nonactionable as a matter of law"). It is also unclear what documents he was referring to, making it hard to prove or disprove the assertion. His statement that "the parents who knew better decided to do *this*" (emphasis added) is similarly imprecise and speculative, as it long preceded the falsified documentation assertion. What exactly did the parents know better? And, what exactly did the parents decide to do? An ordinary viewer would not know. From this and for most of the commentary, it appears Smith was surmising that if the corporate entity of Jackie Robinson West, Inc., knew of eligibility problems, as set forth in the press release, then surely the parents had to know of the problems as well.[8] This was his spin and his take on the news of the day. In that sense, his commentary could also be characterized as supportable interpretation of the events. Overall, Smith's language, viewed in context, trends more towards nonactionable opinion than accurate and verifiable fact. His comments consisted of the very kind of "loose, figurative language" and exaggerated phrases of rhetorical hyperbole protected by the first amendment. See *Imperial Apparel*, 227 Ill. 2d at 397; see also *Moriarty v. Greene*, 315 Ill. App. 3d 225, 236 (2000) (a nonactionable opinion under a defamation *per se* analysis remains nonactionable under a defamation *per quod* analysis).

¶ 57    Plaintiffs nonetheless argue that Smith's comments falsely "painted them as villains to the masses" and, thus, impeached their integrity and reputation. Notably, the Little League press release *does not* ascribe any fault to the team's parents individually or as a group (a matter we discuss in more depth later). While it makes mention of Coach Butler, the release does not identify him as a parent.

---

[8]Notably, plaintiffs do not dispute that the corporate entity, including the Haleys, knew of eligibility issues, as that is one of the main allegations in their complaint.

¶ 58    One can only imagine the shame these accusations on national television would inspire in the parents and children, especially if false. To that extent, Smith's commentary and interpretation of the breaking news of the day, at least given the information presented in this appeal, seems loose and careless. Nonetheless, plaintiffs still have not made clear from their complaint or on appeal how accusations of cheating at a children's sport amount to actionable defamation, especially when none of the parents were singled out by name and Coach Butler was never identified as a parent.

¶ 59    Finally, even if Smith's statements that the parents knew of eligibility problems and also falsified documents were objectively verifiable facts constituting defamation *per quod*, as plaintiffs allege in count III, we agree with the trial court that plaintiffs still have not adequately identified damages. As stated, a *per quod* action requires allegations of specific facts establishing the plaintiffs' special damages. *Anderson v. Vanden Dorpel*, 172 Ill. 2d 399, 416 (1996). General allegations—like damage to an individual's health or reputation, economic loss, and emotional distress—are insufficient to support an action *per quod*. *Schaffer v. Zekman*, 196 Ill. App. 3d 727, 733 (1990). Here, plaintiffs' count III alleged that Smith's statements irreparably "tarnished" their reputations and caused emotional and economic damage and that the damage was "quantifiable" through "lost economic opportunities, family dissension, and lost jobs." Vague allegations like those are not sufficient. See *Anderson*, 172 Ill. 2d at 416-17 (noting allegations that the plaintiff " 'has been damaged monetarily by losing gainful employment and wages' " and that she " 'has suffered great mental pain and anguish and incurred great expense for the treatment thereof' " were insufficient); *Schaffer*, 196 Ill. App. 3d at 733 (same); *cf. Tunca v. Painter*, 2012 IL App (1st) 093384, ¶¶ 62-63 (finding that the plaintiff-doctor pleaded special damages for a *per quod* action, where he identified the decrease of income and drop in referrals, and thus lost patients, and he specified the actual dollar amount of financial loss following the defamatory statements). Plaintiffs also have not sufficiently tied the claim of lost economic opportunities, jobs, or family dissension to Smith's momentary commentary, as opposed any other news coverage of the matter. See *Hardiman v. Aslam*, 2019 IL App (1st) 173196, ¶¶ 27-28; see also *Chang Hyun Moon*, 2015 IL App (1st) 143606, ¶ 16 (affirming dismissal of *per quod* claim where there was no causal connection between the allegedly defamatory statement and special damages); *Maag v. Illinois Coal for Jobs, Growth & Prosperity*, 368 Ill. App. 3d 844, 853 (2006) (noting that the plaintiff judicial candidate failed to identify any voter who would have voted for the candidate but failed to do so because of the allegedly defamatory flyer).

¶ 60    In light of the foregoing, count V, also a claim for defamation *per quod*, suffers a similar fate. There, Coach Butler asserted that Smith's statements irreparably "tarnished" his reputation and caused emotional and economic damage, "specifically by his lost job, lost opportunities for book and movie contracts, and lost reputation." Plaintiffs did not identify what job Coach Butler had. If it was his volunteer job as a little league coach, he had already been suspended from that prior to Smith's comments. Additionally, plaintiffs did not specify what particular book or movie contracts were available to Coach Butler prior to the broadcast. The allegations also fail to support the conclusion that Smith's comments, rather than the press release by Little League and other media attention, caused the losses that Coach Butler claims. See *Hardiman*, 2019 IL App (1st) 173196, ¶¶ 27-28.

¶ 61    As to count IV, Coach Butler's *per se* defamation claim, there was no need to plead special damages. However, the action fails for the reasons stated above, insofar as Smith's mug shot

- 16 -

comment was protected by the first amendment as opinion and rhetorical hyperbole. No other complained-of comment could be construed as defamatory *per se*. For all the reasons stated, plaintiffs' contentions as to counts III, IV, and V must fail.

C. Intentional Infliction of Emotional Distress

We turn next to plaintiffs' contentions involving intentional infliction of emotional distress, a tort first recognized in *Knierim v. Izzo*, 22 Ill. 2d 73, 87 (1961), where a widow was permitted to maintain such an action against the person who killed her husband. The parents contend that the trial court erred in dismissing counts VII and IX-XI against Little League, Jackie Robinson West, Inc./the Haleys, and ESPN/Smith.

To establish intentional infliction of emotional distress, first the conduct involved must be truly extreme and outrageous. *Schweihs v. Chase Home Finance, LLC*, 2016 IL 120041, ¶ 50. Second, the actor must intend that his conduct inflict severe emotional distress or know that there is a high probability that his conduct will cause severe emotional distress. *Id.* Third, the conduct must cause severe emotional distress in the victim. *Id.* Illinois case law makes clear that the standard is high; the tort does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or trivialities. *Public Finance Corp. v. Davis*, 66 Ill. 2d 85, 89-90 (1976); *Lewis v. School District #70*, 523 F.3d 730, 747 (7th Cir. 2008) ("This standard is quite high."); see also *Tobias v. Winkler*, 156 Ill. App. 3d 886, 897 (1987) (finding that the tort is narrowly construed and remains difficult to prove). It is not enough that the defendant acted with a tortious or even criminal intent, that he intended to inflict emotional distress, or that his conduct could be characterized by malice. *Lundy v. City of Calumet City*, 209 Ill. App. 3d 790, 793 (1991). Rather, liability only attaches "where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community" and where the distress, when measured by its intensity and duration, is so severe that no reasonable man could be expected to endure it. Restatement (Second) of Torts § 46 cmt. d, at 73 & cmt. j, at 77-78 (1965); *Schweihs*, 2016 IL 120041, ¶ 51; see also *Doe v. Calumet City*, 161 Ill. 2d 374, 392 (1994), *overruled on other grounds by DeSmet v. County of Rock Island*, 219 Ill. 2d 497 (2006) (stating that conduct reaches that level where "recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' " (Internal quotation marks omitted.)). Given this high standard, a complaint alleging the intentional infliction of emotional distress must be more specific and detailed than normally permissible in pleading a tort action. *Welsh v. Commonwealth Edison Co.*, 306 Ill. App. 3d 148, 155 (1999).

There is no bright-line rule about what satisfies the extreme and outrageous conduct; it is judged by an objective standard, based on all the facts and circumstances of an individual case. *Doe*, 161 Ill. 2d at 392; *Graham v. Commonwealth Edison Co.*, 318 Ill. App. 3d 736, 745 (2000). Relevant factors include (1) whether the defendant holds a position of authority over the plaintiff, abuses that authority, or maintains power to affect the plaintiff's interests; (2) whether the defendant reasonably believed his objective was legitimate; and (3) whether the defendant was aware the plaintiff could be particularly susceptible to emotional distress. *Kolegas*, 154 Ill. 2d at 21; *McGrath v. Fahey*, 126 Ill. 2d 78, 86-90 (1988). Notably, the more control that a defendant has over the plaintiff, the more likely that defendant's conduct will be deemed outrageous, particularly when the alleged conduct involves a threat to exercise that

authority or power to the plaintiff's detriment. *McGrath*, 126 Ill. 2d at 86-87.

¶ 66 As to count VII and count IX, the parents alleged that Little League and Jackie Robinson West, Inc./the Haleys actively concealed the purported eligibility problems, which enabled the team to advance and win the championship title so the defendants could gain media notoriety and financial gain. The parents added that Little League failed to comply with its own rules and then unceremoniously stripped the children of their championship without giving the parents the opportunity to challenge the matter. They maintain all of this constituted extreme and outrageous behavior on the part of Little League and Jackie Robinson West, Inc./the Haleys, given the power those entities and individuals held over the parents.

¶ 67 We cannot agree. We first question the level of authority or power that Little League and Jackie Robinson West, Inc./the Haleys could wield over the parents. Typical examples of individuals who exercise power or authority over a plaintiff include police officers, school authorities, landlords, and creditors. *Id.* at 87; see, *e.g.*, *Doe*, 161 Ill. 2d at 393-95 (finding extreme and outrageous conduct where a police officer was rude and demeaning to a sexual assault victim outside her home and refused to break down her door, while an intruder raped her daughter, due to the officer's fear of liability for property damage). Little League and Jackie Robinson West, Inc., however, are not-for-profit corporations in which the parents voluntarily submitted their children to participate via paid dues and their children's time. For their kids to play, the parents had to submit their children's birth certificates and residency documents to— none other than one of the other parents—Coach Butler. Additionally, there is no allegation that the parents did not have access to the Little League rule book, notwithstanding that Little League ultimately controlled any disputes. Thus, the parents were not parties lacking agency or entirely dependent on Little League or the Jackie Robinson West, Inc./the Haleys. Rather, the allegations show that the parents were autonomous adults with equal capacity to evaluate eligibility matters under the rule book, with one of their own spearheading the team. Plus, there is no indication that Little League or Jackie Robinson West, Inc./the Haleys coerced, threatened, or subjected the parents to a recurring pattern of abusive contact. See *Rudis v. National College of Education*, 191 Ill. App. 3d 1009, 1014 (1989); *cf. Feltmeier v. Feltmeier*, 207 Ill. 2d 263, 275-76 (2003) (finding extreme and outrageous conduct due to a pattern of spousal abuse involving over a decade of verbal insults, humiliation, restricted movement, and physical injury, which caused depression and post-traumatic stress disorder); *Pavilon v. Kaferly*, 204 Ill. App. 3d 235, 245-47 (1990) (upholding claim where employer, knowing plaintiff was susceptible to emotional distress, offered her money for sexual favors, fired her after she refused, and after he fired her, threatened to kill her, rape her, and challenge her child custody rights, and attempted to disrupt her new employment relationship). Little League and Jackie Robinson West, Inc./the Haleys thus did not maintain the position of power or control that the parents claim.

¶ 68 In addition, the allegations do not otherwise show that the actions of Little League or Jackie Robinson West, Inc./the Haleys were extreme and outrageous. According to the complaint, Little League was not presented with eligibility complaints until after the tournament titles were already won, a fact that plaintiffs conceded. This contradicts plaintiffs' sweeping theory that Little League actively concealed any eligibility problems to profit from the team's championship win (a basis for their allegation of extreme and outrageous conduct). Although the players attended the White House and a Major League Baseball World Series game after their win, plaintiffs have not delineated how this would enable Little League or Jackie

Robinson West, Inc./the Haleys to profit financially. See *Anderson*, 172 Ill. 2d at 408 (stating that conclusory allegations unsupported by specific facts are not sufficient to survive dismissal). While plaintiffs alleged that Little League profited by then entering into a deal with ESPN, by this logic, Little League should have further concealed any eligibility problems and never revealed them. Moreover, as the trial court pointed out, the allegations do not show that the parents had special vulnerabilities or were particularly susceptible to emotional pain. *Cf. Kolegas*, 154 Ill. 2d at 22-23 (finding extreme and outrageous conduct where the defendants knew the plaintiffs who suffered a disease were susceptible to emotional pain).

¶ 69 Even assuming that Little League and Jackie Robinson West, Inc./the Haleys concealed eligibility problems, declined to follow the rules, and wielded some authority over the parents, the conduct alleged was not so extreme and outrageous that it surpassed all bounds of decency as to the parents. See *Chang Hyun Moon*, 2015 IL App (1st) 143606, ¶¶ 27-28 (and cases cited therein); *Welsh*, 306 Ill. App. 3d at 155. Given our objective standard, these facts did "not transform conduct which otherwise amounts to no more than insults or indignities into extreme and outrageous conduct." *Rudis*, 191 Ill. App. 3d at 1014. Conduct may be discriminatory, blameworthy, highly inappropriate, and reprehensible, but that does not make it actionable as intentional infliction of emotional distress. See *Van Stan v. Fancy Colours & Co.*, 125 F.3d 563, 568-69 (7th Cir. 1997); see also *Lundy*, 209 Ill. App. 3d at 792 (affirming the dismissal of an emotional distress claim, where the plaintiff-police officers alleged that the defendant stripped them of their badges and guns, made public statements asserting they manipulated their psychological tests or suffered from mental illness, cloaked those statements as official findings in an official order, and purposely sent the order to plaintiffs unsealed and through other officers). If in the little league sports world, disciplinary action, personality conflicts, and terminations could give rise to a cause of action for intentional infliction of emotional distress, then nearly every parent, player, or coach would have a cause of action. See *Welsh*, 306 Ill. App. 3d at 154; see, *e.g.*, *Warren v. United States Specialty Sports Ass'n*, 2006 OK CIV APP 78, 138 P.3d 580 (holding that the tournament director's decision to require a kids' baseball team to forfeit a game, and possibly the state championship, due to an official complaint was not so extreme and outrageous as to constitute intentional infliction of emotional distress). Simply put, plaintiffs have not met the high burden for setting forth their claim.

¶ 70 We reach a similar outcome with respect to plaintiffs' action for intentional infliction of emotional distress against ESPN/Smith. As in their defamation claim, the parents alleged in count X that Smith falsely accused them of falsifying documents and knowingly engaging in deceit and fraud, a matter which Smith then broadcast on national television. The parents alleged that, as a result of this extreme and outrageous conduct, they suffered severe emotional distress. In count XI, Coach Butler also maintained that he suffered severe emotional distress as a result of the mug shot comment. Plaintiffs now rely on *Kolegas*, cited above, in arguing against the dismissal of those counts.

¶ 71 In *Kolegas*, a radio station aired an advertisement paid for by the plaintiff Kolegas for his festival benefiting a foundation for neurofibromatosis, or Elephant Man's disease. Following this, Kolegas appeared in an on-air interview with the two disc jockeys to promote the festival, identifying the cause it benefited. In response to their query, Kolegas stated that his wife and 5-year-old son, also plaintiffs, had the disease. At that point, the radio hosts hung up on Kolegas, then disparaged the festival, and implied that Kolegas' wife was so hideous that no one would marry her except under duress. The hosts also broadcast statements implying that

Kolegas' wife and young child had deformed heads. The supreme court reversed the trial court's dismissal of the emotional distress claim, concluding that the conduct was extreme and outrageous. The court first noted "the power of the media cannot be denied" and reasoned that the radio hosts spouted their falsehoods over the media channels, even as the plaintiff lacked access to rebut the claims. *Kolegas*, 154 Ill. 2d at 22. The court thus concluded that the hosts abused their power over the plaintiffs. The court also reasoned that the hosts had to know that the plaintiffs would be particularly susceptible to emotional distress given their aforementioned disease. The court thus held the pleadings sufficiently alleged the radio hosts' comments were intolerable in a civilized society.

¶ 72        Plaintiffs argue that, as in *Kolegas*, ESPN/Smith held disproportionate power as media and abused their authority to the plaintiffs' emotional detriment. We cannot agree. We find *Kolegas* distinguishable in several important respects. First, while ESPN/Smith undeniably wield the power of the media, the plaintiffs, as parents, were not simply bystanders lacking access to rebut the claims. As stated in their own complaint, the Jackie Robinson West team's story had been widely publicized through various media channels leading up to the complained-of commentary. One of those articles is attached to plaintiffs' complaint. In December 2014, the Chicago Tribune reported on the alleged eligibility scandal and noted that several Jackie Robinson West parents absolutely denied any wrongdoing. For example, one player's father said he and the other parents had "nothing to hide" and that he had acted in the best interests of his son and family. The father stated he would never do anything to embarrass his family or the team. Thus, although ESPN/Smith clearly maintained greater power as a media channel, we cannot say the plaintiffs lacked access to rebut the claims, as was the case in *Kolegas*.

¶ 73        More importantly, ESPN/Smith never named the parents individually on air or identified and then disparaged any particular physical impairment (like the Elephant Man's disease) that would reasonably cause extreme emotional distress. The plaintiffs thus have not identified that they were particularly susceptible to severe emotional distress, unlike in *Kolegas*. Additionally, in *Kolegas*, the supreme court upheld the plaintiffs' actions for defamation *per se* and false light. Here, even assuming Smith stated falsehoods about the parents, implying they cheated, still we cannot say this would cause extreme emotional distress for the same reasons discussed immediately above. We return to the fact that this was a voluntary little league team, and it is certainly a reasonable expectation in the public sports world that cheating accusations will arise and be publicly aired. Even assuming the accusations are false, they cannot lead to an emotional distress claim under the present circumstances involving adult parents who had previously been the subject of publicity and had no identifiable susceptibility to emotional distress.

¶ 74        For the reasons stated, we conclude that the trial court did not err in dismissing counts VII, IX, X, and XI, relating to the parents' intentional infliction of emotional distress cause of action. No reasonable fact finder would find the complained-of conduct was extreme or outrageous. *Cf. McGrath*, 126 Ill. 2d at 92 (noting if a jury could conclude that defendant's alleged conduct was outrageous, then the emotional distress count may survive a motion to dismiss).

¶ 75                    D. Negligent Infliction of Emotional Distress

¶ 76        Plaintiffs next contend the trial court erred in dismissing counts XII-XVIII, all relating to negligent infliction of emotional distress.[9] Generally, to state a claim for negligent infliction of emotional distress, a plaintiff must allege the traditional elements of negligence, which are duty, breach, causation, and damages. *Schweihs*, 2016 IL 120041, ¶ 31; see also *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 703 (7th Cir. 2009). For such claims, Illinois courts separate "bystanders" from "direct victims." See *Corgan v. Muehling*, 143 Ill. 2d 296, 304-05 (1991) (recognizing the different tests applicable to bystanders and direct victims).

¶ 77        Under the "impact rule," a direct victim can recover damages if he suffered emotional distress and a contemporaneous physical injury or impact, requiring actual physical contact of some sort. *Schweihs*, 2016 IL 120041, ¶¶ 31, 38. Our supreme court in *Schweihs*, 2016 IL 120041, ¶¶ 33-43, has reaffirmed that where, as here, plaintiffs allege that they were the direct victims of the defendants' negligent infliction of emotional distress, they must satisfy the "impact rule." See also *Cochran*, 2017 IL 121200, ¶ 15; *Lewis*, 561 F.3d at 703. A direct victim, moreover, need not allege that he suffered physical manifestations from the emotional distress (like those noted immediately below in *Rickey*, for example) as a prerequisite to recovery; emotional injuries stemming from the physical impact or injury alone will suffice. *Schweihs*, 2016 IL 120041, ¶¶ 33, 42 (citing *Corgan*, 143 Ill. 2d at 312); *Lewis*, 561 F.3d at 703.

---

[9]As set forth, this case comes before us via Rule 304(a), which applies where a final judgment in a case involving multiple parties or multiple claims disposes of at least one, but not all, of such parties or claims. Jackie Robinson West, Inc./the Haleys now contend counts XIV (for negligent infliction of emotional distress) and XXII (for civil conspiracy), which were filed on behalf of the players, must be dismissed for lack jurisdiction. They maintain that these counts "arise out of the same operative facts" as count VIII (for intentional infliction of emotional distress), also filed on behalf of the players, which remains pending before the trial court. Citing *Blumenthal v. Brewer*, 2016 IL 118781, ¶ 27, Jackie Robinson West, Inc./the Haleys assert that "where one claim based on the same operative facts is stated differently in multiple counts, the dismissal of fewer than all counts is not a final judgment as to the party's claims as required by Rule 304(a)."

This court, in an earlier order, denied their motion raising the same argument. We once again reject it, finding Jackie Robinson West, Inc./the Haleys' reliance on *Blumenthal* is misplaced. *Blumenthal* involved the division of property between an unmarried couple that had split. There, the dismissed counterclaim, which was appealed through Rule 304(a), "sought precisely the same thing as the underlying cause of action asserted by Blumenthal: division of the value of the parties' Chicago home." *Id.* ¶ 26. Thus, in that case, dismissing the counterclaim did not dispose of "the entire controversy or a separate part thereof," which is what makes an order final and thus appealable. *Id.* ¶¶ 23, 27. This case does not involve domestic relations, marriage, or the division of property, which create their own distinct jurisdictional challenges. See *In re Marriage of Teymour*, 2017 IL App (1st) 161091. Moreover, as our analysis reveals, each of the causes of action remain separate and distinct, requiring different elements. Although they seek similar remedies, the causes of action are not so related that they can be deemed part of a single claim for relief. See *In re Marriage of Best*, 228 Ill. 2d 107, 115 (2008); see also *Rice v. Burnley*, 230 Ill. App. 3d 987, 991 (1992) (noting that an order disposes of a separate branch of a controversy when the grounds for recovery under the various counts arise from different common law doctrines or when different elements are required to recover under different theories). As such, the ruling on counts XIV and XXII disposed of a distinct part of the controversy and was final for the purposes of the present appeal.

¶ 78    In contrast, bystanders may recover if they are in the zone of physical danger and, because of the defendant's negligence, have reasonable fear for their own safety. *Schweihs*, 2016 IL 120041, ¶ 32. The bystander need not have a physical impact or injury at the time of the negligent act, but must have been in " 'such proximity to the accident in which the direct victim was physically injured that there was a high risk to him of physical impact.' " *Id.* (quoting *Rickey v. Chicago Transit Authority*, 98 Ill. 2d 546, 555 (1983)). Therefore, a bystander must show physical injury or illness resulting from the emotional distress caused by the defendant's negligence. *Id.* For example, in *Rickey*, wherein the supreme court adopted the "zone-of-physical-danger rule" for bystander recovery, the plaintiff was an eight-year-old boy who witnessed his five-year-old brother choke and have substantial breathing problems after getting his clothing entangled in a subway escalator. *Rickey*, 98 Ill. 2d at 549. Our supreme court held that the eight-year-old plaintiff could sustain his action (through his parent) for bystander negligent infliction of emotional distress, with an opportunity to replead, where he alleged severe emotional distress and psychiatric trauma that was accompanied by physical symptoms like severe depression and an inability to attend school.

¶ 79    Here, plaintiffs—the Jackie Robinson West players, by and through their parents, and the parents—alleged direct victim negligent infliction of emotional distress against Little League, Jackie Robinson West, Inc./Haleys, and also ESPN/Smith in counts XII-XVII; in count XVIII, Coach Butler alleged the same cause of action against ESPN/Smith. In the various iterations, plaintiffs alleged that due to the defendants' negligent conduct in handling and revoking the little league championship title, plaintiffs suffered from emotional distress and physical manifestations requiring psychological treatment. The emotional distress included depression, anxiety, fear of being in public, feelings of extreme degradation and hopelessness, loss of concentration, and suicidal ideation. Physical manifestations included headaches, nausea, hypertension, muscle spasms, and stomach pain, chest pain, insomnia, and fatigue. The trial court dismissed all counts relating to negligent infliction of emotional distress, finding that "a physical injury to *someone*" (emphasis added) at the very least was required but entirely lacking in the present case and that plaintiffs could not rest their claim on "emotional injuries" alone. Plaintiffs now challenge that determination.

¶ 80    On appeal, plaintiffs essentially concede they did not suffer a physical impact or injury, but they maintain that their physical manifestations of emotional distress are sufficient to support a negligent infliction of emotional distress claim for direct victim liability under the present state of Illinois law. Plaintiffs are confused. Plaintiffs need not, but nonetheless do allege that they suffered from physical symptoms or, in other words, manifestations of emotional distress like "depression, anxiety, weight gain, insomnia, headaches, stomach pains, chest pain, fatigue, muscle spasms," etc. See *Schweihs*, 2016 IL 120041, ¶ 42. Meanwhile, plaintiffs as direct victims are *required* to but do not allege any physical injury or impact that was contemporaneous with (and thus necessarily distinct from) their emotional distress. *Id.* ¶¶ 42-44. In short, there is no direct victim in this case, since none of the plaintiffs suffered a physical impact or injury from defendants' allegedly negligent acts. Plaintiffs cannot bootstrap the requirements for bystander liability to sustain their direct victim claim. In other words, plaintiffs' contention that their physically manifested emotional distress is a "physical injury" of the kind required by the impact rule, is not supported by *Schweihs*, 2016 IL 120041, ¶ 44. Rather, in *Schweihs*, the Illinois Supreme Court affirmed the dismissal of a negligent infliction of emotional distress claim where the plaintiff alleged that she suffered physical symptoms of

emotional distress but "did not plead any physical contact." *Id.* ¶¶ 19, 43-44. *Schweihs* also emphasized that in its prior case, *Corgan*, there was no question that the plaintiff was a direct victim because she had "suffered a physical impact," since "her claim rested on allegations of sexual relations with her therapist." *Id.* ¶¶ 34, 42. Contrary to plaintiffs' contention otherwise, physical contact of some sort is absolutely necessary to sustain a direct victim negligent infliction of emotional distress action.

¶ 81    As adroitly stated in *Manley v. Law*, 889 F.3d 885, 892 (7th Cir. 2018), "Illinois does not create a freestanding legal guarantee of present enjoyment of emotional well-being. Instead, it protects people from certain negligent and intentional actions that injure them. [Citation.] Any legal protection of emotional well-being is contingent on tort doctrines." Plaintiffs have not succeeded in their tort. We therefore agree with the trial court that because plaintiffs have not alleged that defendants' conduct caused any physical injury or impact, they have not stated a cause of action for direct victim negligent infliction of emotional distress. Having found this, we need not address the parties' additional arguments about the element of duty. Accordingly, counts XII-XVIII, alleging negligent infliction of emotional distress, must be dismissed.

¶ 82                                    E. False Light Invasion of Privacy

¶ 83    Plaintiffs next contend that they sufficiently pleaded a false light invasion of privacy cause of action against Little League and ESPN/Smith in counts XIX, XX, and XXI. The tort of false light invasion of privacy protects a person's interest in being let alone from false publicity. *Dubinsky v. United Airlines Master Executive Council*, 303 Ill. App. 3d 317, 331 (1999). Three elements are required to satisfy such a cause of action: (1) the plaintiffs were placed in a false light before the public as a result of the defendants' actions, (2) the false light in which the plaintiffs were placed would be highly offensive to a reasonable person, and (3) the defendants acted with actual malice, that is, with knowledge that the statements were false or with reckless disregard for whether the statements were true or false. *Kolegas*, 154 Ill. 2d at 17-18. Additionally, if a false light invasion of privacy claim is based on statements that are not defamatory *per se*, a plaintiff must allege with particularity that he suffered special damages. *Chang Hyun Moon*, 2015 IL App (1st) 143606, ¶ 17; *Schaffer*, 196 Ill. App. 3d at 736. In other words, special damages must be pled in cases where the claim for false light invasion of privacy is based on language where the defamatory meaning can be established only by reference to extrinsic facts. *Schaffer*, 196 Ill. App. 3d at 736.

¶ 84    Here, in count XIX, the parents alleged that Little League painted them in a false light in the February 11, 2015, press release, which announced that Little League was vacating and thereby revoking the Jackie Robinson West team's regional and national championship titles. In their complaint, the parents pointed to several excerpts in the release, including that the tournament committee had decided that "Jackie Robinson West Little League and Illinois District 4 Administrator knowingly violated Little League International Rules and Regulations by placing players on their team who did not qualify to play because they lived outside the team's boundaries." The release also stated:

> "Jackie Robinson West Little League used a falsified boundary map for their 2014 tournament, and that Jackie Robinson West Little League officials met with other leagues in Illinois District 4 to try to get the territory they wrongfully claimed was theirs for their 2014 tournament. The decision [by Little League International] is based on

falsifying documents and illegally expanding boundaries to include residences that would verify the players' eligibility."

In the release, Keener added that it was "unfortunate that the actions of adults have led to this outcome."

¶ 85 In the complaint, the parents alleged these excerpts referred to them "by proxy" and implied they had falsified documents, intentionally deceived Little League and the public, and placed their own interests above those of their children for publicity. The parents alleged these false statements thereby imputed they had committed "fraudulent, criminal offenses." The statements portrayed them in a false light, they were highly offensive to a reasonable person, and Little League acted in reckless disregard for the truth.

¶ 86 Plaintiffs now argue they sufficiently pleaded a false light cause of action. To bolster their argument, they maintain the excerpts also constituted defamation *per se*, notwithstanding that the parents *never* filed a defamation action against Little League.

¶ 87 While it is not necessary to be defamed to maintain a false light claim, the similarities between the two causes of action may make certain restrictions and limitations equally applicable, such as the innocent construction rule. *Moriarty*, 315 Ill. App. 3d at 237. Under that rule, a statement that is defamatory *per se* is not actionable if it is reasonably capable of an innocent construction. *Id.* at 231. Here, when reading the identified statements within the press release as a whole, with the words given their natural and obvious meaning, as we must, we cannot countenance plaintiffs' contention that the statements in the press release refer to or implicate the Jackie Robinson West parents. Rather, the release directly identifies the guilty parties as Jackie Robinson West officials, district administrator Kelley, and Coach Butler. In particular, it reports Keener as stating that during the review, " 'it became clear that both Jackie Robinson West officials and District Administrator, Mike Kell[e]y signed documents to make players eligible who should not have been.' " The release never identifies Coach Butler as a parent, and only generically refers to "parents." The last paragraph, for example, states that Little League "will continue to work with its volunteers, parents, and players to ensure" it remains "the premier youth sports organization in the world."

¶ 88 As such, even viewing the allegations of the complaint in a light most favorable to the parents, the statements in the release are not defamatory *per se*, but rather are subject to the innocent construction rule. Since there were no false statements directed at the parents, they cannot sustain their false light action. See *Kapotas v. Better Government Ass'n*, 2015 IL App (1st) 140534, ¶ 75 (noting that if the plaintiff fails to state a defamation *per se* cause of action, a count alleging false light invasion of privacy based on the allegedly inherently defamatory statements must fail, as well). Moreover, as set forth above, we do not believe the average reader would equate cheating at little league with an indictable crime. Plaintiffs also do not argue extrinsic evidence would aid their false light action, nor did they plead any special damages. See *Green*, 234 Ill. 2d at 495; *Chang Hyun Moon*, 2015 IL App (1st) 143606, ¶ 17; *Schaffer*, 196 Ill. App. 3d at 736.

¶ 89 As to count XX, the parents sued ESPN/Smith for false light invasion of privacy, and as to count XXI, Coach Butler sued ESPN/Smith for the same cause of action. Those counts, however, are premised on the same allegedly false statements that formed the basis of plaintiffs' defamation claims against ESPN/Smith. They must be dismissed for the same reasons the defamation counts were dismissed. We have already found that most statements Smith made about the parents and Coach Butler were protected opinion and thus cannot form

- 24 -

the basis of a false light claim. See *Moriarty*, 315 Ill. App. 3d at 237 (noting that protected opinion forecloses a false light claim). In addition, plaintiffs failed to allege any special damages in counts XX or XXI, which forecloses any false light claim requiring extrinsic evidence. The trial court therefore correctly dismissed counts XIX-XXI.

¶ 90                            F. Civil Conspiracy

¶ 91    Plaintiffs next contend they alleged sufficient facts to state a cause of action for civil conspiracy, which is an intentional tort wherein two or more people knowingly and voluntarily participate in a common scheme to commit either an unlawful act or a lawful act in an unlawful manner. *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 133 (1999). To state a cause of action for civil conspiracy, a plaintiff must allege an agreement and a tortious act committed in furtherance of that agreement, as well as an injury caused by the defendant. *Lewis v. Lead Industries Ass'n*, 2020 IL 124107, ¶ 20; *Reuter v. MasterCard International, Inc.*, 397 Ill. App. 3d 915, 927 (2010). The agreement is a " 'necessary and important element' " of the claim. *McClure*, 188 Ill. 2d at 133 (quoting *Adcock v. Brakegate, Ltd.*, 164 Ill. 2d 54, 62 (1994)). Mere knowledge of the fraudulent or illegal actions of another is insufficient. *Id.* at 134. Rather, a defendant is liable as a conspirator only where he understands the general objectives of the conspiratorial scheme, accepts them, and agrees (explicitly or implicitly) to help further those objectives. *Id.*

¶ 92    While direct proof of an agreement for civil conspiracy is rare, a plaintiff still must allege sufficient facts to sustain a cause of action. *Farwell v. Senior Services Associates, Inc.*, 2012 IL App (2d) 110669, ¶ 22. Conclusory allegations that the defendants agreed to achieve some illicit purpose and the mere characterization of a combination of acts as a conspiracy are insufficient to withstand a motion to dismiss. *Id.*; *Buckner v. Atlantic Plant Maintenance, Inc.*, 182 Ill. 2d 12, 23 (1998).

¶ 93    In this case, all plaintiffs alleged in count XXII that Little League and Jackie Robinson West, Inc./the Haleys, via various e-mail communications, conspired to conceal the claimed eligibility problems in order to benefit from the team's notoriety and success. Plaintiffs asserted that the claimed eligibility problems were first reported by Janes in September or October 2014, but left unaddressed for months thereafter. This was because Little League and Jackie Robinson West, Inc., "always intended to strip" the players of their championship title, acting recklessly towards them and their parents. Plaintiffs alleged this concealment was done to inflict emotional distress on plaintiffs and cast them in a false light.

¶ 94    This count suffers from a number of deficiencies, the principal one being the absence of facts showing that there was an actual agreement among these defendants. There are no specific factual allegations that each of the defendants understood the general objectives of the conspiratorial scheme and accepted them by acting in furtherance of those objectives. Plaintiffs, instead, simply assert, in a conclusory fashion, the existence of a conspiracy, with proof being that the defendants emailed one another. Again, this mere characterization of acts by the defendants as a conspiracy is insufficient to withstand a motion to dismiss. See *Buckner*, 182 Ill. 2d at 23; see also *Reuter*, 397 Ill. App. 3d at 928. Likewise, plaintiffs are less than clear as to what "unlawful act" the defendants aimed to achieve. We do not believe concealment of a matter for the sake of notoriety or generally acting recklessly towards someone's well-being can be characterized as unlawful. Moreover, as set forth above, we have already found insufficient the allegations that defendants intentionally or negligently inflicted emotional

- 25 -

distress on the plaintiffs (respectively, counts VII, IX-XI, and XII-XVIII) or painted them in a false light (counts XIX-XXI).[10] Because plaintiffs have failed to prove the existence of these underlying independent tort actions, they cannot prove the existence of conspiracies for those actions. See *Lewis*, 2020 IL 124107, ¶ 54; *Davis v. Times Mirror Magazines, Inc.*, 297 Ill. App. 3d 488, 499 (1998). For all these reasons, count XXII was properly dismissed.

¶ 95                          III. CONCLUSION

¶ 96        Based on the foregoing, we affirm the judgment of the trial court dismissing counts III-V, alleging defamation; counts VII and IX-XI, alleging intentional infliction of emotional distress as to the parents; counts XII-XVIII, alleging negligent infliction of emotional distress; counts XIX-XXI, alleging false light invasion of privacy; and count XXII, alleging civil conspiracy. As set forth, we reverse the trial court's judgment as to counts I and II, respectively alleging breach of implied contract and promissory estoppel, insofar as we hold reinstatement of the championship title is a possible remedy. Thus, this ruling should be taken into consideration as the children's case proceeds before the trial court in case No. 18 L 00178.

¶ 97        Affirmed in part and reversed in part.

_____

[10]As set forth, the trial court did not dismiss counts VI and VIII, alleging that Little League and, Jackie Robinson West, Inc./the Haleys, intentionally inflicted emotional distress on the team's players. While these counts could still theoretically support the civil conspiracy cause of action, as noted, count XXII remains deficient for other reasons.

# LITTLE LEAGUE® INTERNATIONAL FINDS JACKIE ROBINSON WEST LITTLE LEAGUE VIOLATED RULES AND REGULATIONS

🖨 Print

## *Suspensions Handed Out, U.S. Championship Title Revoked, Special District Advisor To Be Named*



ELECTRONICALLY FILED
11/15/2016 7:33 PM
2016-L-001428
PAGE 43 of 56

February 11, 2015

After an extensive review of the operations of Jackie Robinson West Little League and Illinois District 4, the Little League International Charter/Tournament Committee has determined that the Jackie Robinson West Little League and Illinois District 4 Administrator knowingly violated Little League International Rules and Regulations by placing players on their team who did not qualify to play because they lived outside the team's boundaries.

The Charter/Tournament Committee has decided to vacate the league's wins from the 2014 Little League Baseball® International Tournament, including its Great Lakes Regional and United States Championships, and suspend team manager, Darold Butler, from Little League activity. Illinois District 4 Administrator, Michael Kelly, has also been removed from his position. Jackie Robinson West Little League has been placed on probation with its tournament privileges suspended until such a time that new leadership in the positions of President, Anne Haley, and Treasurer, Bill Haley, have been elected or appointed, and that the league is fully compliant with all Little League International Regulations.

Little League International found that Jackie Robinson West Little League used a falsified boundary map for their 2014 tournament, and that Jackie Robinson West Little League officials met with other leagues in Illinois District 4 to try to get the territory they wrongfully claimed was theirs for their 2014 tournament.

"For more than 75 years, Little League has been an organization where fair play is valued over the importance of wins and losses," said Mr. Stephen D. Keener, Little League International President and CEO. "This is a heartbreaking decision. What these players accomplished on the field and the memories and lessons they have learned during the Little League World Series tournament is something the kids can be proud of, but it is unfortunate that the actions of adults have led to this outcome. As our Little League operations staff learned of the many issues and actions that occurred over the course of 2014 and prior, as painful as this is, we feel it a necessary decision to maintain the integrity of the Little League program. No team can be allowed to attempt to strengthen its team by putting players on

- 27 -

their roster that live outside their boundaries."

## TIMELINE

In September 2014, following the conclusion of the Little League Baseball World Series, a league official from a neighboring district in Illinois first expressed concerns pertaining to players' residencies to the attention of the Little League Central Region staff in Indianapolis, Ind. At the end of October, that local league official then provided additional documentation to support his allegations. Little League International operations staff fully reviewed the allegation and information. Using age and residency/school attendance and boundary documentation provided to Little League International by Jackie Robinson West Little League and verified by the District Administrator, Little League International determined the players' eligibility based on all of the information that had been provided at that time. In mid-December, during this process, however, Little League began to learn of multiple issues with boundary maps and operational process with multiple leagues in Illinois District 4. In an effort to be fair to all the leagues in Illinois District 4, Little League International began organizing one-on-one, private meetings with leagues in the district where they could discuss their concerns and work on preparing for the 2015 season. In early January, through a media report, Little League first learned of a league within Illinois District 4 alleging misconduct by Jackie Robinson West Little League.

ELECTRONICALLY FILED
11/15/2016 7:33 PM
2016-L-001428
PAGE 44 of 56

On January 31, Little League International officials held meetings with Illinois District 4 officials and the leagues in the district. During these meetings, Little League International learned of several operational issues within the entire District that have occurred over the course of many years under different leadership at the District level. These issues are spread amongst leagues throughout the district and include a breakdown in communication of roles and responsibilities among District and league leadership and misunderstandings in multiple league boundaries. Various local league officials confirmed that the boundary issues stem from a boundary map redrafting process that started prior to the 2013 season and includes maps that were agreed upon amongst all the leagues, but had never been properly submitted to Little League International through the official process. Little League International also learned that Jackie Robinson West Little League knowingly expanded its boundaries to include territory that belonged to other leagues in the district without approval from the other leagues or the Little League International Charter Committee, as stated in Little League's Official Regulations and Playing Rules. Little League International also found that Jackie Robinson West Little League used a falsified boundary map for their 2014 tournament, and that Jackie Robinson West Little League officials met with other leagues in Illinois District 4 to try to get the territory they wrongfully claimed was theirs for their 2014 tournament. The decision is based on falsifying documents and illegally expanding boundaries to include residences that would verify the players' eligibility.

"Little League takes these matters very seriously and has spent countless hours gathering information about the many issues facing Jackie Robinson West Little League and Illinois District 4," said Mr. Keener. "During our review, it became clear that both Jackie Robinson West officials and District Administrator, Mike Kelly signed documents to make players eligible who should not have been."

Within Little League's operational structure, it is the District Administrator's responsibility to verify player eligibility based on documents supporting participation, age, and residency/school enrollment that are signed by the League President, League Player Agent, and Team Manager. Those signatures and documents are then reviewed at every level of the tournament, based on the District Administrator's initial verification. During tournament play, if any league has a question about player eligibility on an opposing team, they are encouraged to file an official protest, which is reviewed by the Little League International Tournament Committee. At no point during the 2014 regular season, tournament season, or since allegations of misconduct began to be reported, has Little League International been contacted by a league in Illinois District 4 about the use of illegal players within the Jackie Robinson West Little League. It wasn't until the meetings in January, 2015 that local league officials confirmed that they had direct knowledge of this rule violation, but never reported it to Little League International, as is common with local league operations.

ELECTRONICALLY FILED
11/15/2016 7:33 PM
2016-L-001428
PAGE 45 of 56

"Little League relies heavily on the commitment of principled volunteers to serve as a system of checks and balances in preparation of and throughout Little League International Tournament Play," said Mr. Keener. "Unfortunately, no allegations against Jackie Robinson West Little League were made until well after the tournament ended, contributing to the difficulty of resolving these many complex issues. As an organization, Little League has faced issues similar to this in the past, and we felt that we must take the appropriate action set by that precedent."

This is the third time in the 68-year history of the Little League Baseball World Series that punitive actions have led to vacating wins from a league – first in 1992 with the disqualification of Zamboanga (Philippines) City Little League and again in 2001 with Rolando Paulino Little League from Bronx, N.Y.

By default, the 2014 championships vacated by Jackie Robinson West Little League will be given to the other finalists in those games, with Mountain Ridge Little League (Las Vegas, Nev.) handed the 2014 United States Little League Baseball World Series Championship; New Albany (Ind.) Little League handed the 2014 Great Lakes Regional Little League Baseball Championship; Tri-Cities Little League (West Dundee, Ill.) given the 2014 Illinois State Little League Baseball Championship; Lansing (Ill.) Little League handed the 2014 Illinois Section 3 Little League Baseball Championship; and Rosemoor Little League (Chicago) given the 2014 Illinois District 4 Little League Baseball Championship.

"Little League is committed to helping all of our volunteers in more than 80 countries provide positive baseball and softball experiences for children in more than 7,000 communities," said Mr. Keener. "As there are many issues to resolve within Illinois District 4, our operations staff is committed to working with local volunteers to ensure that all the leagues in the district are operated fairly and under full compliance of Little League International's rules and regulations and that the children in the Chicago area have a meaningful Little League experience in 2015 and beyond."

Little League operations staff will be appointing a special advisor to Illinois District 4. The advisor will be veteran District Administrator with knowledge of the Chicago area. The Little League operations staff and the special advisor will work with

- 29 -

Illinois District 4 Officials and league leadership to ensure all operations and boundary issues fully comply with Little League International rules and regulations and properly communicated through the appropriate channels with the Little League Charter Committee, at which point, Jackie Robinson West Little League's probation will be lifted.

Little League International is committed to providing the best youth baseball and softball experience in the world, and will continue to work with its volunteers, parents, and players to ensure that Little League remains the premier youth sports organization in the world.

ELECTRONICALLY FIL
11/15/2016 7:33 PM
2016-L-001428
PAGE 46 of 56

ELECTRONICALLY FILED
11/15/2016 7:33 PM
2016-L-001428
PAGE 48 of 56

**Cari Champion:** Breaking news: After an extensive review of operations of the Jackie Robinson West Little League, Little League International has determined that they knowingly violated rules and regulations by placing players on their team who did not qualify to play because they lived outside the team's boundaries. The Little League tournament committee has decided to vacate all wins from the 2014 Little League Baseball World Series for that team including its Great Lakes regional and United States championships and suspended team manager, Darold Butler from Little League activity. Let's listen to the president speak on this situation.

**Little League Pres.:** We had to do this. We had no choice. We have to maintain the integrity of the Little League program. Certainly no one should cast any blame, any aspersions on the children who participated on this team. To the best of our knowledge, they had no knowledge that they were doing anything wrong and they were just kids out playing baseball which is obviously the way it should be. They were celebrated for that by many many organizations, many people and so what were most concerned about today is it's going to be hard on these kids and that's the part that breaks our hearts.

**Cari Champion:** Well that's-well, it's well said, Stephen A, the children have to pay for adult mistakes, what's your reaction to this?

**Stephen A. Smith:** I'm in pain over this one, to be quite honest with you, because of those kids. They're innocent in all of this by all accounts. They were of age, they came together as a team, they just went out there and they compete and obviously Mo'ne Davis we loved her, we loved what we saw from her and what have you and the people bring stuff like that up and you see these stories and they just resonates with you in such a profoundly positive way and the adults screw it up because of, you know, starving for notoriety, starving for recognition, starving to win and willing to sell kids dreams out in order to pull it off. If there can be good news taken from this it's a couple of things: Number one, this Little League has existed for 75 years, this is only the third time it has happened where they've had to take a move of this measure. Two other times would be primarily due to over-aged players participating, one from the Philippines, another one from the Bronx with, you know, I forgot the-

**Skip Bayless:** Almonte?

**Stephen A. Smith:** Almonte. That's it, Danny Almonte. He was over age. This is the third time this has happened. It doesn't happen every day. It doesn't happen every other year for crying out loud. It's rare. Number two, let's put their names out here. You gotta team manager by the name of Darold Butler suspended from any little league activity. Good. We've got Michael Kelly, Illinois District 4 administrator removed from his position. Good. Hopefully it will be permanently because this is completely and utterly unnecessary. You know-and let me also add what really

resonates to me and what makes this hurt even more Skip. This is called the Jackie Robinson West Team. Jackie Robinson, as renowned a figure in sports annuls as ever there was, responsible for integrating major league baseball in 1947, an iconic and revered, ideafied figure in our community and in American history. You have his name attached to this because it's Jackie Robinson West, ok? First all African American team to win the championship and this is how you did it. Just disgraceful.

**Skip Bayless:** It is.

**Stephen A. Smith:** It's a shame and the only thing we have to be thankful-thank god the kids really had nothing to do with this. They're victims in all of this just as much as anybody else. A bunch of adults and parents who knew better-parents who knew better decided to do this. Pox on all of their houses. They should all be ashamed of themselves.

**Skip Bayless:** So starting with Darold Butler, they shamed the name of Jackie Robinson.

**Stephen A. Smith:** Yes, they did.

**Skip Bayless:** And here we have another fractured fairy tale to deal with because it was a fairy tale. These kids got honored by President Obama at the White House—

**Cari Champion:** I know.

**Skip Bayless:** - and I still don't have any problem with that-

**Cari Champion:** No.

**Skip Bayless:** -because they earned that.

**Stephen A. Smith:** They earned that.

**Cari Champion:** Yea, they did.

**Skip Bayless:** And yet, if only there a way to keep the adults out of the kids' game. This is downside to televising on, national TV, a kids game because the adults know that the adults can become, at least for 15 minutes, famous, right?

**Stephen A. Smith:** That's right.

**Skip Bayless:** About 15 minutes, you're gonna be famous. I knew-I wasn't sure what his name was, but I saw Darold Butler a lot on national TV during that run, right?

**Cari Champion:** Yes.

**Skip Bayless:** I know his face.

**Stephen A. Smith:** I'd like to see it again.

**Skip Bayless:** Yea, maybe we should show it again.

- 32 -

ELECTRONICALLY FILED
11/15/2016 7:33 PM
2016-L-001428
PAGE 49 of 56

ELECTRONICALLY FILED
11/15/2016 7:33 PM
2016-L-001428
PAGE 50 of 56

**Stephen A. Smith:** Let's get a picture of Darold Butler.

**Skip Bayless:** Fair enough. Alright.

**Stephen A. Smith:** Since you want to sit there and throw kids in to the wind like this this. If this was somebody else-if it was a professional athlete, if one of these kids had gotten in trouble or something like that, we'd put their face up. Let's put Darold Butler and Michael Kelly's face up on national television. Treat it like the mug shot it deserves to be treated like. How about that?

**Skip Bayless:** This story also says that there were other local league officials in Chicago who knew of these violations but did not speak up. I guess you can't condemn them for that. But they knew and they didn't speak up until they had to when they got questioned by officials from the larger Little League organization. So in the end, what I hate the most about this Stephen A, is that-help me out here-do you think some of these kids knew that they were-they were crossing boundaries they weren't supposed to cross? Again the parents were saying "do it," the manager's saying "do it" but your sending such a bad message to kids, surely some of the kids-they know the rules, they knew they weren't in this district.

**Cari Champion:** Yea, but they don't know any better-

**Skip Bayless:** They don't know any better.

**Cari Champion:** -because they're kids.

**Skip Bayless:** So mom or dad or Darold Butler says "it's ok, it's ok, this is just the way we're gonna do this, we're gonna get this done, we need to go win this, we're the Jackie Robinson, blah blah blah-you know?

**Stephen A. Smith:** Usually-

**Skip Bayless:** It's a bad message.

**Stephen A. Smith:** Usually in the case of kids, you don't necessarily know. You might suspect, but then somebody says, you know, "no, we're taking care of that it's ok," and you move on because you a kid, because you a kid, but the adults knew, the parents knew, the coach, the administrator-they knew, and they did it anyway hoping that folks would never find out while they got their 15 minutes of fame. They didn't think about the kids. They thought about themselves. The parents-the parents have to prove a Little League place Skip-parents have to prove where they live. So what I'm saying to you is that there's been some falsified documentation-

**Cari Champion:** Sure

**Stephen A. Smith:** - or something going on here because you knowingly engaged in deceit-

**Skip Bayless:** You did.

**Stephen A. Smith:** So you can have your kid play ineligibly. Inexcusable.

- 33 -

| | |
|---|---|
| **Cari Champion:** | Alright. |
| **Stephen A. Smith:** | Inexcusable. |
| **Cari Champion:** | Point of order, Jackie Robinson West is the 3rd all African American team. |
| **Stephen A. Smith:** | Yes. |
| **Cari Champion:** | We leave it there, again, it is unfortunate that the children have to pay for these adult mistakes. |
| **Stephen A. Smith:** | Ok. |
| **Cari Champion:** | Coming up next we switch gears, Dez or Demarco or both? What should the Cowboys do this offseason? That's a tough question but the gentlemen have the answers. We'll return in just a few moments. |

\*\*\*

ELECTRONICALLY FILED
11/15/2016 7:33 PM
2016-L-001428
PAGE 51 of 56